# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ANTHONY CARLTON DUNLAP, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-03120-CV-S-BCW-P |
| | ) | |
| GREENE COUNTY JUSTICE CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This civil rights case was filed pro se by Plaintiff, who is incarcerated in the Federal Correctional Institution in Butner, North Carolina, for claims arising during his time of confinement as a federal detainee at the Greene County Justice Center ("GCJC") in Springfield, Missouri. Before the Court is Defendants' second motion for summary judgment. Doc. 183. For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part.

## I. Background

Plaintiff brings this action against the following Defendants: (1) Sheriff Jim Arnott, (2) Lieutenant Jenkins, (3) Sergeant Childress, (4) Dr. Jason Wilkins, a medical doctor with the sole authority to prescribe medications in the GCJC, (5) Officer Morgan, (6) Officer Glover, (7) Corporal Roberts, (8) Dr. Kylie Walker, a licensed psychologist, (9) Dr. Melissa Ussery, the Director of Mental Health Services, (10) Officer Cody Richison,[1] and (11) three Jane Doe nurses.[2] Plaintiff names Defendants in their individual and official capacities. Doc. 11.

---

[1] Plaintiff's original action contained additional defendants, e.g., the GCJC, Officer Spalding, and Nurse Atchison. Plaintiff omitted these defendants from his superseding complaint, Doc. 11, and therefore there are no pending claims against them. As Plaintiff was advised, "It is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect." Doc. 10 at 4 (citing *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000)). Plaintiff was further advised that if he "wishes to name [] additional individuals as defendants, he must file an amended complaint that clearly does so." Doc. 13 at 2 n.2.

[2] Defendants were ordered to provide names of the unknown defendants (Doc. 13 at 3), but they did not provide those names to the Court. However, despite engaging in discovery which appears to have led to the identity of at least one of the nurses (*See* Doc. 183-1 at 17), Plaintiff never sought to amend his complaint. These Defendants are therefore dismissed without prejudice. Plaintiff may wish to seek recovery against the nurses in a separate action, though the Court expresses no opinion on the viability of any such action.

The main crux of this case concerns Plaintiff's medical treatment and his bunk assignments while he was confined in the GCJC. As best as the Court can discern, Plaintiff alleges (1) that Defendant Childress was deliberately indifferent to Plaintiff's serious medical needs after Plaintiff fell from a bunk, (2) that Defendant Richison was deliberately indifferent to Plaintiff's serious medical needs for assigning him a top bunk after the medical department had mandated that he sleep on the bottom bunk, ultimately leading to injuries from a fall, (3) that Defendants Wilkins, Walker, and Ussery violated the Eighth Amendment by not attending to Plaintiff's need for prescription medication, (4) that Defendant Morgan violated the Eighth Amendment by not providing Plaintiff his inhaler during an asthma attack, (5) that various defendants did not provide a bottom bunk to Plaintiff in violation of the Eighth Amendment, (6) that the GCJC has an unconstitutional policy or custom of halting medications when inmates arrive at the facility, (7) that Defendant Arnott is responsible for various constitutional violations based on his position as sheriff, (8) that the GCJC's grievance policy is unconstitutional, (9) that Defendant Glover discriminated against Plaintiff based on race, (10) that Defendant Jenkins and various other Defendants retaliated against him, and (11) that Defendants' various actions violated the Americans with Disabilities Act ("ADA"). Plaintiff seeks a declaratory judgment, injunctive relief, unspecified compensatory and punitive damages, and recovery of costs.

## A. January 4, 2017: Intake and "Bottom bunk/bottom tier only" Status

At the time of initial booking into the jail, inmates who are suspected of suffering from drug withdrawal are placed on a protocol that includes that they not sleep on the top bunk in a cell. Doc. 183-5 at 2; Doc. 183-6. When GCJC medical staff assigns a "bottom bunk/bottom tier only" status, they do not differentiate between a lower bunk, a "boat," or simply using a mattress on the floor, and the only distinction is between upper and lower tier. Doc. 183-5 at 2. A "boat" is a transportable plastic encasement that holds a mattress and is sometimes placed in a cell designed for two inmates so as to allow for a third inmate to sleep on the floor. Doc. 183-5 at 2; Doc. 183-1 at 17, 18. Most general population pod cells have two bunks, but there are times when detention staff will put three inmates in a cell, and if there are not three bunks, they may use a boat or simply place a mattress on the floor. Doc. 183-5 at 2. Inmates are generally free to sleep wherever they wish, subject to bunk availability or subject to another inmate being assigned to a bottom bunk per the medical doctor. Doc. 183-5 at 2.

Detention staff (a.k.a. corrections staff) are non-medical staff and assign inmates to specific

2

pods and cells. Doc. 183-5 at 1. When an inmate is assigned to a pod, the inmate takes a mattress from a stack and brings it to the pod. Docs. 183-1 at 40; 183-5 at 2. The inmate can then place the mattress in an available bunk, or place it in a "boat," or simply place it on the floor. Doc. 183-5 at 2.

On or about January 4, 2017, Plaintiff arrived at GCJC and went through the intake procedures. Doc. 183-1 at 8. Nursing staff noted that Plaintiff suffered a shattered left elbow, and had been shot three times in his right arm. Doc. 183-1 at 7-8.

Detention staff assigned Plaintiff to "bottom bunk/bottom tier status," and Plaintiff's "belief" was that the assignment was due to physical injuries in both arms and/or due to his "mental health issues."[3] Doc. 183-1 at 8, 10. Plaintiff did not know the exact reason. Doc. 183-1 at 7.

The uncontroverted medical record indicates that Plaintiff was placed on "bottom bunk/bottom tier only" status for a different reason. Specifically, GCJC medical notes dated January 4, 2017, show that due to concerns regarding drug withdrawal, per Defendant Wilkins' orders, Plaintiff was placed on the GCJC opiate protocol, which includes sleeping "bottom bunk/tier only." Doc. 183-6.

**B. January 7, 2017: Fall From Top Bunk**

On or about January 7, 2017, Plaintiff asked Defendant Richison for clarification about when the move to a bottom bunk would take place even though he had already been assigned to the bottom tier by the medical department. Doc. 11 at 5. Defendant Richison responded, "I don't give a f*** about a bottom bunk. Move!" Doc. 11 at 5.

Plaintiff was then moved into cell C-211, where he was "assigned" a top bunk; it is not clear why there were no portable boats or temporary bunks available for the cell. Doc. 183-1 at 14. He had one cellmate. Doc. 183-1 at 15.

At some point after entering this cell, Plaintiff attempted to climb into the top bunk as directed. Doc. 183-1 at 15. Plaintiff is unable to say how or why he fell; nevertheless, it is undisputed that Plaintiff fell in attempting to climb to the upper bunk. Docs. 11 at 5; 181-1 at 15. Upon regaining consciousness, Plaintiff explained to nursing staff that he had suffered injuries to his head and neck and that he had dislocated or broken several fingers. Doc. 11 at 6. Plaintiff also reported he had a knot on his head and that he felt dizzy and nauseated. Doc. 183-1 at 16. At this point, the nurses shined a light in Plaintiff's eyes and asked him some questions. Doc. 183-1 at 16.

---

[3] Plaintiff's allegation appears to be that he needed a "chair height" place to sleep due to his physical and/or mental impairments. Doc. 183-1 at 46.

3

Plaintiff requested to see a doctor due to nausea. Doc. 11 at 6. Defendant Childress assured the nurses that Plaintiff would be okay. Doc. 11 at 6. Plaintiff again asked Defendant Childress to see a physician, and Defendant Childress responded, "that ain't gonna happen." Doc. 11 at 6; *see also* Doc. 183-1 at 17, 18. Jane Doe One left. Doc. 183-1 at 18. Upon Plaintiff's request to see a physician, Defendant Childress stated to Defendant Richison, "'I don't give a f*** if you throw a boat in there on him.'" Doc. 183-1 at 18.

At this point, Defendant Richison directed Plaintiff to get up off the floor, and Plaintiff told him he could not get up and that he felt like he was going to throw up. Doc. 183-1 at 21. Defendant Richison then grabbed Plaintiff by the arm, lifted him from the floor, and set him down on a seat at a desk. Doc. 183-1 at 21. About 15 to 25 minutes later, Plaintiff was moved to another cell. Doc. 183-1 at 22.

Plaintiff additionally swears that he complained of "head, neck, back and hand injuries over the following two weeks, but was ignored and mislead [sic] about physician injury assessment." Doc. 11 at 7.

### C. March 24, 2017: Medical Intake and Asthma Attack

Sometime after the January 8, 2017, incident, Plaintiff, who as noted above, was a federal detainee, left the GCJC to undergo a mental health evaluation in a Bureau of Prisons facility in Chicago related to his federal criminal case. Doc. 183-1 at 24-25. A Bureau of Prisons psychiatrist prescribed Zyprexa and Cymbalta relating to Plaintiff's competency to proceed to trial. Doc. 183-3 at 3-4. Along with Zyprexa, Cymbalta, and Flonase, Plaintiff also had an albuterol inhaler and two more inhalers. Doc. 183-1 at 26.

On March 24, 2017, Plaintiff was returned to the GCJC. Doc. 183-1 at 25. With the exception of an albuterol rescue inhaler that Plaintiff kept in his pocket, Plaintiff's medications were transported with him in a bag from the Bureau of Prisons facility in Chicago and were turned over to the GCJC staff at the booking desk. Doc. 183-1 at 26.

Upon arrival, Plaintiff was told to relinquish the inhaler he had kept in his pocket despite telling Officer Rohrer, who is not a defendant, that he needed it. Doc. 183-1 at 26. Officer Rohrer told Plaintiff that medical staff would look at his medications and return his medications to him immediately after documenting what he was taking. Doc. 183-1 at 26-27.[4]

---

[4] Incidentally, the booking video provided by Defendants appears to corroborate some of these facts. Doc. 183-4. In the video, Plaintiff arrives with what appears to be a bag of medications and an inhaler on his person. He

On that same date, March 24, 2017, Plaintiff suffered an asthma attack in his cell and did not have his inhaler. Doc. 183-1 at 27. Plaintiff told officers he was suffering the attack. Doc. 183-1 at 27. When Plaintiff explained that he was having trouble breathing, Officer Cleany,[5] who is not a defendant, responded that Defendant Jane Doe Three, who was on the phone, said "there's nothing they can do about it." Doc. 183-1 at 27. Nobody assessed Plaintiff. Doc. 183-1 at 27.

### D. March 24-26, 2017: Suicide Cell Assignment

Also on or about March 24, 2017, Plaintiff refused to go to cell B-226 because it had two inmates, and Plaintiff would have had to sleep on the floor. Doc. 183-1 at 30.[6] Plaintiff repeatedly told an officer that he refused to go into that cell and asked to be placed in administrative segregation. Doc. 183-1 at 31. Upon arrival to administrative segregation, Plaintiff again was directed to a cell that already had two inmates. Doc. 183-1 at 31. Again, there was no portable bunk or boat. Doc. 183-1 at 32. Plaintiff intentionally "made statements that warranted placement in an observation cell." Doc. 183-1 at 31. Plaintiff could not remember what he said verbatim to be placed in observation, "but it was something to the effect of suicidal or homicidal ideations." Doc. 183-1 at 31.

When there is reason to believe inmates may hurt themselves or others, they may be placed in an "observation cell" or "suicide cell" for observation by mental health staff. Doc. 183-1 at 29. Pod "T4" is part of the GCJC that is used to separate inmates from general population for observation due to medical or mental health concerns. Doc. 183-1 at 35. T4 is different from other pods in that it has about half as many cells, some of the cells do not have furnishings, and there are cameras in them. Doc. 183-1 at 35-36. Plaintiff was assigned a cell in T4 that had furniture including a bunk, desk, toilet, sink, and bookshelf. Doc. 183-1 at 36. Unlike general population cells, this cell had a bookshelf and a window with a view of the courthouse and was more spacious. Doc. 183-1 at 36.

Plaintiff alleges that Defendant Jenkins was in T4 on March 25, 2017, responding to a call that did not involve Plaintiff, and Plaintiff tried "to get his attention." Doc. 183-1 at 33. Defendant Jenkins ignored him until Plaintiff "said something to the effect of 'are you having just conversations

---

has a discussion with an unknown officer about what appears to be his inhaler, and Plaintiff is told: "This is the booking process. They'll make sure you have access to it upstairs."

[5] This name is spelled different ways in the record. *See* Doc. 11 at 7.

[6] Defendants appear to maintain that Plaintiff could have slept either on a "boat" or a mattress on the floor, but Plaintiff testified there was no portable bunk or boat when he was placed in the cell. Doc. 183-1 at 31-32.

with whites only today?'" Doc. 183-1 at 33, 79. Plaintiff then asked Defendant Jenkins why Plaintiff was "in a suicide cell with bunks, shelves and corners that could injure me," and asked if someone could talk to him. Doc. 183-1 at 33. Plaintiff said that Defendant Jenkins responded by saying something like, "you're absolutely right," and corrections officers then moved Plaintiff to a cell without furnishings and placed two inmates who had been in that cell into the one that Plaintiff was removed from. Doc. 183-1 at 33-34.

Plaintiff alleges the second cell was "devoid of anything besides a toilet and a sink." Doc. 183-1 at 36. Plaintiff alleges Defendant Jenkins retaliated against him for complaining and placed him in a cell where Plaintiff could not "maneuver off the floor when I need to use the restroom or get up and get my trays." Doc. 183-1 at 34.

On March 26, 2017, Plaintiff could not get the attention of correctional officers to alert them that he could not maneuver to use the toilet. Doc. 183-1 at 37. Therefore, he defecated and urinated in the middle of the cell floor. Doc. 183-1 at 37. He was served two meals in the presence of feces and urine, though Plaintiff does not state by whom or otherwise connect those allegations with any defendant with specificity. Doc. 11 at 8.

### E. March 27 and 28, 2017: Defendants Walker and Ussery Met with Plaintiff [7]

According to Defendant Ussery, on March 27, 2017, three days after Plaintiff was returned to the GCJC from Chicago and placed into a "suicide cell" for observation, Plaintiff was evaluated by Defendant Walker, a psychologist. Doc. 183-3 at 2. While that meeting may have resulted in Plaintiff being maintained on observation for his suicidal/homicidal statements, Plaintiff's anti-psychotic medication was not returned. Doc. 183-3 at 2.

Defendant Ussery further states that she met with Plaintiff on March 28, 2017, and March 30, 2017, to review his observation status. Doc. 183-3 at 2. Defendant Ussery states that at that time, she and Defendant Walker determined Plaintiff was not evincing any signs of mental illness. Doc. 183-3 at 3.

Plaintiff appears to assert that these meetings occurred in April of 2017 (a month after he returned from his visit to the Bureau of Prisons rather than three days) and that they were the sole basis on which Defendants Walker and Ussery formed an opinion as to Plaintiff's need for the

---

[7] There is conflict or ambiguity in the record as to whether these meetings happened in March or April of 2017. Compare Doc. 183-3 at 2 (affidavit of Defendant Ussery) with Doc. 183-1 at 49 (Plaintiff's sworn statement that he met with Defendant Wilkins on April 24, 2017, inquiring about medications that had been discontinued a month earlier though Plaintiff "had never seen Dr. Wilkins or any other doctor here").

psychiatric medication that had been prescribed by a Bureau of Prisons psychiatrist. Doc. 183-1 at 93.

Plaintiff further asserts that Defendant Walker kept him in the observation cell even though she determined he was not in need of any medication for any mental health reasons. Doc. 183-1 at 93. As to Defendant Ussery, Plaintiff again asserts her role in denying him medication, and further says that she has fabricated the interviews and only met with him on March 28, 2017, "for maybe 10 minutes." Doc. 183-1 at 94. As to the medical records, entries dated March 27, and March 28, 2017, reflect only "observation." Doc. 183-10 at 1.

### F. March 30 and 31, 2017: "Bottom bunk/bottom tier only" Status

On March 30, 2017, Plaintiff was removed from the observation unit and returned to the B-Pod with a mattress on the floor. Doc. 11 at 9. Plaintiff alerted Defendant Roberts to his bunk restriction, and Plaintiff was told to use a mattress on the floor. Doc. 11 at 9. Plaintiff alleges he had to be lifted from the floor by a cellmate. Doc. 11 at 9.

On March 31, 2017, Defendant Glover told Plaintiff to pack his property and directed Plaintiff to a cell on the bottom walk. Plaintiff again wanted a bottom bunk but was told that he can sleep on a "boat" on the floor because "medical says there's no difference." Doc. 11 at 9. Plaintiff showed Defendant Glover his left "handicapped arm" and Defendant Glover told him to "make due." Docs. 183-1 at 45; 11 at 9.

### G. April 5, 2017: Asthma Attack

On or about April 5, 2017, Plaintiff pressed the emergency call button because he was in need of his asthma inhaler. Doc. 11 at 10-11. A "few minutes" went by with no response. Doc. 183-1 at 47. Plaintiff again pushed the emergency call button. Doc. 183-1 at 47. He does not know much time passed because he was "gasping for breath, so it seemed like an eternity." Doc. 183-1 at 47. Defendant Morgan answered the call and Plaintiff related that he was having an asthma attack and asked for his inhaler. Doc. 183-1 at 47. Defendant Morgan responded, "You're hollering, so evidently, you can breathe. Just take small breaths." Doc. 183-1 at 47. He further told Plaintiff to "fall back." Doc. 183-1 at 47.

Plaintiff later asked Defendant Morgan whether he knew what a rescue inhaler is for, and Defendant Morgan responded, "It's for emergencies." Doc. 183-1 at 48. Plaintiff asked whether Defendant Morgan thought it was "reasonable to withhold one from someone for over ten

7

minutes," and Defendant Morgan responded, "No, but you were getting loud with me."  Doc. 183-1 at 48.

### H.  On or about April 5, 2016: Medications

GCJC Staff did not provide Plaintiff any of the medications prescribed to him by the Bureau of Prisons until roughly ten days after he returned to GCJC from Chicago.  Doc. 183-1 at 52.  At that point, he was provided Cymbalta, an albuterol inhaler and another inhaler, without having seen a doctor at the GCJC.  Doc. 183-1 at 52.  He was not provided the antipsychotic medication, Zyprexa, at that time.  Doc. 183-1 at 52.

### I.  April 12, 2017:  Hive eruption

On or about April 12, 2017, Nurse Sampson, who is not a defendant, saw Plaintiff for a complaint of "hive eruption."  Doc. 183-1 at 50.  She directed Plaintiff to report any future hive eruptions to the pod officer, who would alert the medical department.  Doc. 183-1 at 50.  Plaintiff reported the matter 30 times, but the medical department was maybe alerted four times.  Doc. 183-1 at 51.  Plaintiff does not specify to whom he complained about hives, and he does not assert a claim related to the lack of treatment for hives but refers to it as a pattern of behavior.  Doc. 183-1 at 74.

### J.  April 23-24, 2017:  Medication

On April 23, 2017, Plaintiff had another "hive eruption," saw a nurse, and was placed on the doctor's call list.  Doc. 11 at 10.  The following day, he saw Defendant Wilkins for complaints of hives, a tumor in his sinus cavity, and a concern that the discontinuation of medications without an assessment had caused him "medical issues."  Docs. 11 at 19; 183-1 at 49.  More specifically, Plaintiff inquired about the medications that had been discontinued a month earlier, on March 24, 2017, though he had never seen Defendant Wilkins or any other GCJC doctor.  Doc. 183-1 at 49.  In other words, the scope of Plaintiff's conversation with Defendant Wilkins was a query on how Defendant Wilkins chose "which medications to continue and discontinue without examining me."  Doc. 183-1 at 53.  Plaintiff explained to Defendant Wilkins that Plaintiff "had been placed on an antipsychotic by a mental health professional that had a – that did a forensic examination on me."  Doc. 183-1 at 53.  Additionally, Plaintiff mentioned another medication he had been prescribed for the hives and for a tumor in his sinuses.  Doc. 183-1 at 53.

In response, Defendant Wilkins told Plaintiff that he "had no need for the medications that had been prescribed."  Doc. 183-1 at 49.  Defendant Wilkins further stated that he would have

8

Plaintiff evaluated by mental health staff to see whether he needs the medication.  Doc. 183-1 at 54.

### K. April 26, 2017:  Hive eruption

By "happenstance," Nurse Sampson was in Plaintiff's wing on April 26, 2017, allowing Plaintiff to show her "hive eruptions all over my body."  Doc. 183-1 at 51.

### L. April 27, 2017:  Appointment with Defendants Wilkins, Walker, and Ussery, and the GCJC's Medication Policy

On or about April 27, 2017, Plaintiff had an appointment with Defendant Wilkins, Defendant Walker, and Defendant Ussery about the discontinuation of his antipsychotic medications.  Doc. 11 at 11.  Despite medical records reflecting that Plaintiff had been prescribed these medications for more than ten years and despite the evaluation and prescription of those medications by a psychiatrist with the Bureau of Prisons, Defendants Wilkins, Walker, and Ussery refused to re-start Plaintiff's antipsychotic medications.  Docs. 11 at 11; 183-1 at 55.

Plaintiff asked these defendants why they discontinued his medication when he had never been evaluated by them.  Doc. 183-1 at 55.  More specifically, Plaintiff asked Defendant Ussery whether she believed that half a dozen mental health professionals over a 12-year period were all wrong and had given Plaintiff the wrong medication, and Defendant Ussery responded, "It happens."  Doc. 183-1 at 55.

Based on Plaintiff's complaint that he was not getting medication as prescribed by a doctor with the Bureau of Prisons, on some unspecified date, Defendant Wilkins spoke with the United States Marshals Service and "found that [Plaintiff] had a competency evaluation and was apparently already taking Zyprexa and Cymbalta."  Doc. 183-3 at 3-4.  Plaintiff's Zyprexa prescription was re-started, but it is unclear exactly when.  Doc. 183-3 at 3-4.

Plaintiff further complains that Defendants halted his medication based on a blanket policy of halting all medications at intake without timely evaluating the inmate by a doctor or mental health professional.  Doc. 183-1 at 56.  Relevant to those allegations, GCJC's medication policy states:

> [I]nmates are not automatically prescribed medications without documentation that they already had a prescription within thirty days of becoming an inmate; absent a current prescription, inmates would only receive new prescriptions if they were suffering a life-threatening condition or exhibited symptoms of a disorder that requires medication management or that impairs functioning and where medication is recommended.

9

Docs. 182-2 at 2; 183-3 at 2.

### M. May 3, 2017: Mattress in Segregation

On this date, Plaintiff alleges Lieutenant Smith, who is not a defendant, placed Plaintiff in segregation for "invoking his right to be represented by an attorney in court." Doc. 11 at 12. Plaintiff had to sleep on a "book thin mattress on [the] cell floor." Doc. 11 at 12. He blames Defendant Arnott for these events. Doc. 183-1 at 57.

### N. May 15, 2017: Mattress in General Population and Retaliation

On this day, Plaintiff was removed from segregation but again was given a mattress to sleep on the floor. Doc. 11 at 12.

Also on this date, Plaintiff alleges GCJC staff fabricated an incident report and placed him in segregation for his reluctance to go to court. Doc. 11 at 12. Plaintiff's specific complaint is that he did not want to go to court because he had not been on the psychiatric medications prescribed to him that were relevant to the proceedings and that he was placed in segregation for making complaints about his treatment in GCJC. Doc. 183-1 at 61, 68.

Additional facts are set forth as necessary.

## II.     Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment on a claim only if he has made a showing that "there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." *Van Wyhe v. Reisch*, 581 F.3d 639, 648 (8th Cir. 2009); *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 884-85 (8th Cir. 2009). In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008) (citation omitted). The inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527

(8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). Finally, Rule 56(c) "mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. Discussion: Civil Rights Claims

By way of overview, 42 U.S.C. § 1983 provides, in relevant part:[8]

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

This statute was designed to provide "a broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "[O]ne cannot go into court and claim a violation of § 1983—for § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617 (internal quotation omitted). Rather, § 1983 provides a remedy for violations of the "rights, privileges, or immunities secured by the

---

[8] Section 1983 claims are unavailable against federal defendants because of § 1983's state action requirement. *See* 42 U.S.C. § 1983; *Schutterle v. United States*, 74 F.3d 846, 848 (8th Cir. 1996). But an action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics* is available against federal officers. 403 U.S. 388 (1971). In determining whether a federal officer's actions violate a plaintiff's Constitutional rights under Bivens and its progeny, the same analysis applies as in section 1983 cases. *See Duffy v. Wolle*, 123 F.3d 1026, 1037 (8th Cir. 1997) ("[A]n action under *Bivens* is almost identical to an action under section 1983, except that the former is maintained against federal officials while the latter is against state officials); *Sellers ex rel. Sellers v. Baer*, 28 F.3d 895, 898-99, 902-03 (8th Cir. 1994) (using the same analysis to conclude that federal and state officials' conduct was "not actionable under *Bivens* or § 1983").

11

Constitution and laws [of the United States]." § 1983; *see also Albright*, 510 U.S. at 271 (stating that § 1983 "merely provides a method for vindicating federal rights elsewhere conferred") (internal quotation omitted); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (noting that the phrase "Constitution and laws" means that § 1983 provides remedies for violations of rights created by federal statutes, as well as those created by the Constitution). Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution [or] laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011) ("To state a claim under § 1983, a plaintiff must allege (1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right.").

In response to a claim under 42 U.S.C. § 1983, a defendant may assert the defense of qualified immunity, as Defendants have done here. The Eighth Circuit has explained that:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.

*Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citations omitted). "The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates 'clearly established statutory or constitutional rights.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Officials are entitled to qualified immunity only to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (quoting *Harlow*, 457 U.S. at 818). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials from "a mistake of law, a mistake of fact, or a mistake

Case 6:17-cv-03120-BCW   Document 202   Filed 05/07/19   Page 12 of 32

based on mixed questions of law and fact." *Id.* (quotation omitted). Put another way, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, ___ U.S. ____, 134 S.Ct. 3, 5 (2013) (internal quotations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)) (internal quotation marks omitted).

The Court uses a two-part test to determine whether a government official is entitled to qualified immunity. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014). The first part of this test is to determine "whether the facts alleged, construed in the light most favorable to [Plaintiff], establish a violation of a constitutional or statutory right." *Clayborn v. Struebing*, 734 F.3d 807, 809 (8th Cir. 2013). The second part of this test is to determine "whether that right was clearly established at the time of the alleged violation, such that a reasonable officer would have known [his] actions were unlawful." *Id.* (internal quotation omitted).

### A. Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.[9] "Deliberate indifference to the serious medical needs of a prisoner constitutes cruel and unusual punishment . . . and the Constitution prohibits state governments from inflicting such punishments." *Merlin v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)). "A prima facie case alleging such deliberate indifference requires the inmate-plaintiff to demonstrate that he suffered from an objectively serious medical need and that prison officials actually knew of, but deliberately disregarded, that need." *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007) (citation omitted). The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment. *Id.*

---

[9] Generally, a pretrial detainee's civil rights claim must be analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). However, "[p]risoners and pretrial detainees are protected under the Constitution from a state actor's deliberate indifference towards the inmate's serious medical needs." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 698 (8th Cir. 2016). In this vein, the Eighth Circuit recognizes that "the same standard of care is appropriate" for both convicted inmates and pretrial detainees; the Eighth Amendment's protections from "deliberate indifference to a prisoner's serious medical needs" applies to both classes upon "claims that prison officials unconstitutionally ignored a serious medical need or failed to protect the detainee [or inmate] from a serious risk of harm." *Butler v. Fletcher*, 465 F.3d 340, 344-45 (8th Cir. 2006); *see Kahle*, 477 F.3d at 550 (the pretrial detainee-convicted inmate distinction "makes little difference as a practical matter" in this context).

13

Put another way, to establish a claim for deliberate indifference, a plaintiff must show that: (1) he suffered objectively serious medical needs and (2) prison officials actually knew of but deliberately disregarded those needs. *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)) (additional citation omitted). The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citation omitted). "Whether a prison's medical staff deliberately disregarded the needs of an inmate is a fact-intensive inquiry." *Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010) (citations omitted).

### 1. Defendant Childress is not entitled to summary judgment concerning Plaintiff's allegations relating to injuries sustained from falling off a bunk.

In his superseding amended complaint (Doc. 11), Plaintiff alleges Defendant Childress violated Plaintiff's Eighth Amendment rights relating to Plaintiff's fall from a top bunk while the medical department had mandated that he sleep only in the bottom tier/bunk. He alleges constitutionally inadequate treatment and pain.

#### a. Serious Medical Needs

As to the first prong, a serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Id.* (citation omitted).

In his complaint, Plaintiff makes sworn statements that he "suffered head, neck, and what seemed to be dislocated or broken fingers" as a result of the fall. Doc. 11 at 6. He claims that he requested to be seen by a doctor due to nausea. Doc. 11 at 6. He further claims that Defendant Childress told nursing staff that Plaintiff would be okay and that Plaintiff would not be allowed to see a physician. Doc. 11 at 6. Plaintiff additionally swears that he complained of "head, neck, back and hand injuries over the following two weeks, but was ignored and mislead [sic] about physician injury assessment." Doc. 11 at 7. Additionally, Plaintiff alleges that the nurses

14

dispatched to examine him did not fully do so and instead heeded Defendant Childress's statement that Plaintiff would be okay.

After careful review, the Court finds that Plaintiff's sworn statements concerning Defendant Childress's treatment of the injuries Plaintiff sustained from a fall from the top bunk constitute serious medical needs.

### b. *Deliberate Indifference*

The Court next turns to the second prong, whether Defendants actually knew of but disregarded those needs. "Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness: disregarding a known risk to the inmate's health." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). While medical negligence does not violate the Eighth Amendment, "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). While it is true that courts hesitate to find an Eighth Amendment violation when a prison inmate has received medical care, that "[h]esitation does not mean . . . that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (citations omitted).

As set out above, Plaintiff complained of pain and nausea from his fall immediately upon waking up from the fall and continued to complain about his injuries for two weeks. Taken together, the sworn allegations support a claim for liability under the Eighth Amendment for deprivation of medical care. *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (holding that a genuine issue of material fact existed as to whether defendants were deliberately indifferent to serious medical needs when they failed to arrange for dental treatment until about six weeks after the inmate's written request, causing further pain and infection); *see also Blaisdell v. Tanner*, No. 00-1318JRTJGL, 2001 WL 34623999, at *4 (D. Minn. June 14, 2001) (denying defendant's motion for summary judgment where medication provided was not relieving pain from osteoarthritis); *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (holding that factors such as "evidence that the patient repeatedly complained of enduring pain with no modifications in care" may give rise to liability for an Eighth Amendment claim); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (holding that "repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results").

15

In so finding, the Court notes that, generally, an inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to serious medical needs. *Coleman*, 114 F.3d at 784. However, "a need for medical attention that would have been obvious to a layperson [makes] submission of verifying medical evidence unnecessary." *Hartsfield*, 371 F.3d at 457 (holding that no affidavit was necessary where inmate presented evidence that he suffered extreme pain from loose and infected teeth, which caused blood to seep from his gums, swelling, and difficulty eating and sleeping) (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 8th Cir. 1999) (holding that inmate who complained about serious physical conditions from failure to treat diabetes did not need to submit verifying medical evidence to establish detrimental effects of alleged delay in treatment because conditions inmate described would have been obvious to a layperson); *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995) (holding that a serious medical need is one that is either obvious to a layperson or supported by medical evidence)).

Here, Plaintiff alleges that he fell from an assigned top bunk (the use of which was prohibited for Plaintiff by the medical department) and that as a result he suffered a concussion along with pain and injuries. Despite alerting Defendant Childress to his injuries, Plaintiff's injuries went untreated for some two weeks. The Court finds that Plaintiff has set forth sworn statements indicating that his need for medical treatment would be obvious to a layperson and that sworn allegations that Defendant Childress substituted of his own judgment over that of a nurse obviates the need for verifying medical evidence.

Defendant Childress is not entitled to summary judgment as to Plaintiff's allegations under the Eighth Amendment concerning treatment for injuries due to his fall from the top bunk.

**2. Defendant Richison is not entitled to summary judgment concerning Plaintiff's allegations relating to injuries sustained from falling from a bunk**.

In his complaint, Plaintiff alleges Defendant Richison violated Plaintiff's Eighth Amendment rights relating to Plaintiff's fall from a top bunk because the medical department had mandated that he sleep only in the bottom tier/bunk but Defendant Richison assigned him to the top bunk. He alleges constitutionally inadequate treatment and pain as a result of a fall from the top bunk.

### a. *Serious Medical Needs*

As noted above, as to the first prong, a serious medical need is "one that has been diagnosed

by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784 (citation omitted). Here, the medical department at the GCJC determined that Plaintiff needed to sleep on the bottom bunk/bottom tier based on the opiate protocol. There is thus at least a jury question as to whether Plaintiff had a serious medical need.

### b. Deliberate Indifference

The Court next turns to the second prong, whether Defendant Richison actually knew of but disregarded those needs. As noted above, "[d]eliberate indifference entails a level of culpability equal to the criminal law definition of recklessness: disregarding a known risk to the inmate's health." *Allard*, 779 F.3d at 772.

In this case, Plaintiff asked Defendant Richison about his bunk status, and Defendant Richison responded, "I don't give a f*** about a bottom bunk. Move!" Doc. 11 at 5. Viewed in the light most favorable to Plaintiff, the facts indicate that as a result of Defendant Richison's assignment of Plaintiff to the top bunk, Plaintiff fell and sustained injuries.

Defendant Richison is not entitled to summary judgment as to Plaintiff's allegations under the Eighth Amendment concerning the top bunk assignment that resulted in injuries due to a fall.

### 3. Defendants Wilkins, Walker, and Ussery are not entitled to judgment as a matter of law as to Plaintiff's Eighth Amendment claim concerning the provision of previously prescribed medication.

Plaintiff additionally alleges an Eighth Amendment violation for Defendants Wilkins, Walker, and Ussery's failure to ensure he received all of his prescription medication after he returned from Chicago for a psychiatric evaluation concerning his federal criminal case.

### a. Serious Medical Needs

As noted above, as to the first prong, a serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784 (citation omitted). "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Id.* (citation omitted).

Here, Plaintiff was transported from the GCJC to be evaluated by a psychiatrist at the Bureau of Prisons and then was returned to the GCJC with prescriptions for Zyprexa, Cymbalta,

and Flonase; he also had an albuterol inhaler that he kept on his person, and two more inhalers. Doc. 183-1 at 26. When he arrived back at GCJC, all medications were turned over to CGJC staff, and Plaintiff was told to relinquish his inhaler even after Plaintiff told Officer Rohrer, who is not a defendant, that he needed it. Doc. 183-1 at 26. Officer Rohrer told Plaintiff that medical staff would look at his medications and get him his medications immediately after documenting what he was taking. Doc. 183-1 at 26-27.

The duty to provide medical care extends to mental health needs. *Smith*, 919 F.2d at 92-93 (citation omitted); *see also Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) (holding that "[p]rison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs."); *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citations omitted) (holding that the "duty to provide medical care encompasses detainees' psychiatric needs"). Additionally, asthma is a serious medical need. *See Washington v. Denney*, 900 F.3d 549, 560 (8th Cir. 2018).

Thus, Plaintiff has met the first prong of the test.

### b. Deliberate Indifference

The Court next turns to the second prong, whether each of these Defendants actually knew of but disregarded those needs. As noted above, "[d]eliberate indifference entails a level of culpability equal to the criminal law definition of recklessness: disregarding a known risk to the inmate's health." *Allard*, 779 F.3d at 772.

Here, viewing the facts in the light most favorable to Plaintiff, Defendant Wilkins, who was responsible for overseeing prescriptions, and Defendants Walker and Ussery, who met with Plaintiff concerning his physical and mental health and as part of his Treatment Team, did not fully follow up on Plaintiff's need to continue his medications until Plaintiff filed a grievance, which he alleges was about a month after he returned to the GCJC with a bag full of prescriptions and inhalers. Meanwhile, Plaintiff went without psychiatric medication that was necessary for his competency hearing and at one point was under suicide watch. Additionally, on the same date that Plaintiff returned to the GCJC, he was placed in a cell without any member of the medical staff having reviewed his file, and he suffered an asthma attack in his cell. He was not provided his inhalers until roughly ten days after he returned from Chicago with those prescriptions.

As noted above, while medical negligence does not violate the Eighth Amendment, "medical treatment may so deviate from the applicable standard of care as to evidence a

18

physician's deliberate indifference." *Moore*, 255 F.3d at 545. In so finding, the Court notes that even though Defendant Wilkins was the only defendant who had the authority to issue prescriptions, a reasonable jury could find that Defendants Walker and Ussery were also deliberately indifferent to Plaintiff's serious medical needs because they were responsible for reviewing his mental health needs and did not investigate or factor in the assessment from the Bureau of Prisons that Plaintiff needed to continue his psychiatric medications for his competency proceedings.

After review of the record, the Court finds that Defendants Wilkins, Walker, and Ussery are not entitled to summary judgment as to Plaintiff's claims concerning the failure to provide medication.

### 4. Defendant Morgan is not entitled to summary judgment as to Plaintiff's claim that he withheld Plaintiff's inhaler.

As noted above, asthma constitutes a serious medical need. *See Washington*, 900 F.3d at 560.

As to whether Defendant Morgan was deliberately indifferent, the record indicates that on or about April 5, 2017, Plaintiff pressed the emergency call button because he was in need of his asthma inhaler. Doc. 11 at 10-11. A "few minutes" went by with no response. Doc. 183-1 at 47. Plaintiff again pushed the emergency call button. Doc. 183-1 at 47. Defendant Morgan eventually answered the call and Plaintiff related that he was having an asthma attack and asked for his inhaler. Doc. 183-1 at 47. Defendant Morgan responded, "You're hollering, so evidently, you can breathe. Just take small breaths." Doc. 183-1 at 47. He further told Plaintiff to "fall back."

Plaintiff later asked Defendant Morgan whether he knew what a rescue inhaler is for, and Defendant Morgan responded, "It's for emergencies." Doc. 183-1 at 48. Plaintiff asked whether Defendant Morgan thought it was "reasonable to withhold one from someone for over ten minutes," and Defendant Morgan responded, "No, but you were getting loud with me." Doc. 183-1 at 48.

After review of the record, the Court finds that Plaintiff has set forth sworn statements indicating enough evidence that a reasonable jury could find that Defendant Morgan was deliberately indifferent to Plaintiff's serious medical needs.

19

**5. Except as noted above all, Defendants are entitled to judgment as a matter of law as to Plaintiff's Eighth Amendment claims concerning bottom bunk/boat/mattress assignments because Plaintiff cannot establish that his conditions of confinement were unconstitutional or that his serious medical needs were not addressed as to these allegations.**

The next question is whether Defendants are entitled to summary judgment as to Plaintiff's claims regarding his cell and/or bunk assignment. To the extent Plaintiff challenges his bed assignment as an unconstitutional condition of confinement, the Court notes that "[t]he Constitution 'does not mandate comfortable prisons'"; rather, humane conditions of confinement include "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). To support an Eighth Amendment violation against Defendants, Plaintiff must allege and prove the existence of objectively harsh conditions of confinement, together with a subjectively culpable state of mind by Defendants in condoning or creating the conditions. *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993). The "defendant's conduct must objectively rise to the level of a constitutional violation . . . by depriving the plaintiff of the 'minimal civilized measure of life's necessities.'. . . . The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (quoting *Rhodes*, 452 U.S. at 342, and *Estelle v. Gamble*, 429 U.S. 97, 104 (1977)). Courts within this circuit have recognized that "prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities." *Wilson v. Holloway*, No. 5:18-CV-05039, 2018 WL 1161396, at *2 (W.D. Ark. March 5, 2018). "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

In this case, Plaintiff has failed to establish that sleeping on a bottom tier, without more, is an unconstitutional condition of confinement.

To the extent Plaintiff complains he was not provided a bottom bunk as opposed to the option of sleeping on a mattress or on a boat (or the bottom bunk), as best as can be discerned, Plaintiff is alleging that Defendants were deliberately indifferent to his serious medical needs. Plaintiff appears to make two arguments concerning cell assignments: first, he argues his constitutional rights were violated inasmuch as he was not permitted a bottom bunk at various

times during his confinement in the GCJC; second, he argues his constitutional rights were violated with respect to placement in a suicide cell.

As to Plaintiff's claim concerning his entitlement to a bottom bunk at various times during Plaintiff's confinement at GCJC, the Court agrees with Defendants that Plaintiff has not established an Eighth Amendment violation. Medical notes dated January 4, 2017, indicate that due to concerns regarding drug withdraw, Plaintiff was placed on opiate protocol, which includes sleeping "bottom bunk/tier only."  With the exception of the incident regarding Defendants Childress and Richison, *supra*, the record indicates that Plaintiff could have placed a mattress in an available bottom bunk, on a "boat," or on the floor, and that he would have been in compliance with directions from medical staff in doing so. Plaintiff indicated during his deposition that it was his "belief" that he was assigned a bottom bunk because of his physical needs *or* because of his mental health issues. He was not sure. Although Plaintiff believes he needed a bottom bunk and that he could not sleep on the floor, Plaintiff has presented no evidence other than his broad statements that he was in need of more restrictive requirements than were assessed by the medical department.

Plaintiff's claim concerning assignment to a suicide cell similarly fails. Plaintiff told an officer that he refused to go into a cell that already had two inmates because he would have had to sleep on a "boat" or on a mattress on the floor. Plaintiff instead told officers he would go to administrative segregation. Again, however, although Plaintiff suffered a shattered left elbow and gunshot wounds prior to arriving at the GCJC and although Plaintiff has a history of mental health problems, Plaintiff has not put forth any evidence to show that he was assessed or should have been assessed as needing any more restrictive bunk restrictions than he was provided.[10]

---

[10] Moreover, as to either claim, even accounting for Plaintiff's physical infirmity, on this record, there is no indication that Defendants knew that the cell assignment exacerbated any physical or mental injuries.  *See Fudge v. Page*, No. 5:09-cv-00004-SWW-JJV, 2011 WL 768001 (E.D. Ark. Feb. 8, 2011); *see also Blackwell v. Selig*, 26 F. App'x 591, 592 (8th Cir. 2001) (holding that inmate sleeping on the floor on a four-inch-thick mattress for five nights did not amount to an unconstitutional condition of confinement, particularly when he failed to show that defendants knew he suffered pain whenever he raised his mattress to allow his cell door to be opened); *O'Leary v. Ia. State Men's Reformatory*, 79 F.3d 82, 84 (8th Cir. 1995) (holding it was not an Eighth Amendment violation for a prisoner to be held in a cell without clothing, a mattress, bedding, exercise, or visits); *Williams v. Delo*, 49 F.3d 442, 446 (8th Cir. 1995) (holding it was not an Eighth Amendment violation for a prisoner to be put in a strip cell for four days without clothing, a mattress, bedding, running water, or hygiene products); *Seltzer-Bey v. Delo*, 66 F.3d 961 (8th Cir. 1995) (holding that placement in a cell with no running water, clothing, bedding, or mattress for two days was not an Eighth Amendment violation).  Key to this case, Plaintiff's conclusory allegations from his complaint and the undisputed facts do not provide any ground for relief.  Further, "courts have neither the duty nor the time to investigate the record

21

Defendants are thus entitled to summary judgment as to any claim concerning Plaintiff's cell or bunk assignment.[11]

### 6. Defendants are entitled to judgment as a matter of law as to Plaintiff's allegations of an unconstitutional custom or policy.

As best as can be discerned, Plaintiff alleges that Defendants have an unconstitutional policy or custom of delaying or denying medication that inmates were receiving upon intake. To bring a suit against Defendants in their official capacity, Plaintiff must show either an unconstitutional policy or may establish custom by showing:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation."

*Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2010) (citations omitted). "The pattern of unconstitutional conduct must be so pervasive and widespread so "as to have the effect and force of law." *Id.* (citation omitted).

Here, the medication policy in place at all relevant times was the following:

> inmates are not automatically prescribed medications without documentation that they already had a prescription within thirty days of becoming an inmate; absent a current prescription, inmates would only receive new prescriptions if they were suffering a life-threatening condition or exhibited symptoms of a disorder that requires medication management or that impairs functioning and where medication is recommended.

Docs. 182-2 at 2; 183-3 at 2.

In this case, it is undisputed that Plaintiff was not provided medications that were prescribed to him by the Bureau of Prisons' medical professionals. However, although Plaintiff alleges in his complaint that the GCJC has a custom or policy of denying inmates their medicine upon intake, the written policy does not reflect that. Regardless, however, Plaintiff provides no

---

in search of an unidentified genuine issue of material fact to support a claim or a defense." *Libel v. Adventure Lands of Am., Inc.*, 482 F.2d 1028, 1032 (8th Cir. 2007).

[11] As set forth in the factual background, Plaintiff alleges that he was served two meals in the presence of urine and feces. However, he does not specify who served him those meals and the allegations do not appear to be connected to any particular defendant. *See Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (§ 1983 liability requires some personal involvement or responsibility).

basis to support his claims of a widespread policy other than his own experience indicating that medicines were delayed or denied.[12]  *See Remington v. Hoopes*, 611 F. App'x 883, 885-86 (8th Cir. 2015) (affirming grant of summary judgment on plaintiff's official capacity claim because plaintiffs failed to allege facts showing that defendants acted pursuant to a government policy or custom); *Brown v. Stovall*, No. 4:09-cv-4008, 2010 WL 3761346, at *3-4 (W.D. Ark. Aug. 30, 2010) (granting defendants' summary judgment on the basis that Plaintiff presented "no evidence of a custom or policy of Miller County regarding 'failure to insure proper medical and mental health treatment by refusal to provide consistent healthcare'").

 In short, Plaintiff has failed to establish the existence of an unconstitutional custom or policy and has failed to show causation assuming there was such a policy.  *See Brewington*, 902 F.3d at 802.  Defendants are entitled to judgment as a matter of law as to this claim.

### 7. Defendant Arnott is entitled to judgment as a matter of law as to any claim based in *respondeat superior*.

Plaintiff's claim against Defendant Arnott fails because Plaintiff does not establish that Defendant Arnott was personally involved in the deprivation of Plaintiff's constitutional rights. By way of overview, "[s]ection 1983 will not support a claim based on a *respondeat superior* theory of liability."  *Polk Cnty. v. Dodson*, 454 U.S. 312, 454 (1981).  Moreover, an administrator who lacks "medical expertise cannot be held liable for the medical staff's diagnostic decisions[,]" nor can he "substitute [his] judgment for a medical professional's prescription."  *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).

Here, Plaintiff fails to set forth specific facts indicating any personal involvement of Defendant Arnott.  Rather, as best as can be discerned, Plaintiff's claim against Defendant Arnott appears to be grounded in his overall responsibilities for the operation of the GCJC.  Therefore, Plaintiff is attempting to recover under a theory of *respondeat superior*, which is not an actionable claim under § 1983.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Monell*, 436 U.S. at 658; *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Marchant v. City of Little Rock*, 741 F.2d 201, 204-205 (8th Cir. 1984).

---

[12]Although an unconstitutional government policy could be inferred from a single action taken by the highest officials responsible for setting policy in that area of the government's business, Plaintiff presents no evidence that Defendant Arnott—or any other defendant—has done so in this case.

As such, Defendant Arnott is entitled to summary judgment as to claims based in *respondeat superior*.

### 8. Defendants are entitled to summary judgment as a matter of law as to claims concerning the grievance process.

Notwithstanding the doctrine of *respondeat superior*, Plaintiff's claim against Defendant Arnott and other defendants fails for the additional reason that Plaintiff did not allege a violation of a federally protected right. More to the point, there is no substantive constitutional right for a prisoner to have his or her grievances answered. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993). "In the context of a state prison system, an inmate grievance procedure is not constitutionally required." *Spencer v. Moore*, 638 F. Supp. 315, 316 (E.D. Mo. 1986). "If the state elects to provide a grievance mechanism, violations of its procedures do not deprive prisoners of federal constitutional rights." *Id.* "Therefore, a state's failure to follow its grievance procedures does not give rise to a § 1983 claim." *Id.* Put another way, "a state grievance procedure does not confer any substantive constitutional right upon prison inmates." *Isaac v. Unknown Flenoid, et al.*, No. 1:16CV27 SNLJ, 2016 WL 2609793, at *2 (E.D. Mo. May 6, 2016) (citations omitted). That is because "[w]hen the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance." *Flick v. Alba*, 932 F.2d 728 (8th Cir. 1991); *see also Moore v. Thurber*, 105 F.3d 663, 663 (8th Cir. 1997) (applying *Buckley* in suit against county jail); *Williams v. Robinson*, 623 F. App'x 822, 833 (8th Cir. 2015) (citing *Buckley* with approval in case against county jail).

Accordingly, because Plaintiff's complaint that Defendants failed to adequately address his grievance is not a cognizable claim, Defendants are entitled to judgment as a matter of law.

### 9. Defendant Glover is entitled to judgment as a matter of law as to Plaintiff's allegations of racial discrimination.

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In essence, the Equal Protection Clause requires the government "to treat similarly situated people alike." *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)) (holding no valid equal protection claim where plaintiff failed to present evidence to enable the court to discern the contours of the class to which he claimed to be similarly

situated and only ambiguously asserted denial of an adequate opportunity to practice his religion). Thus, as a "threshold matter," a plaintiff must allege less-favorable treatment than similarly situated persons specifically "on account of . . . membership in a protected class." *Bogren v. Minn.*, 238 F.3d 399, 408 (8th Cir. 2000); *see Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("Absent a threshold showing that [a plaintiff] is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.").

Next, a plaintiff must show "that the different treatment is based upon either a suspect classification or a fundamental right." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008). The Supreme Court has determined that race classification is a suspect classification for constitutional equal protection analysis. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720-21 (2007). Lastly, because Plaintiff's equal protection claim is premised on a race classification, Plaintiff must also allege the different treatment was motivated by "discriminatory intent." *Hernandez v. New York*, 500 U.S. 352, 372-73 (1991).

Here, Plaintiff has failed to show that he received treatment different than similarly situated persons. As best as the Court can discern, Plaintiff's only allegation in the complaint is that he has "evidence" that unspecified defendants "showed preferential treatment to Caucasian inmates in relation to housing assignments" on some unspecified date. Doc. 11 at 5. In his deposition, Plaintiff specified that his complaint was against Defendant Glover because he saw Defendant Glover make an African-American inmate move from a boat to a top bunk to put a white inmate in a boat. Doc. 183-1 at 81. Plaintiff testified that the top bunk was empty and that he believed the African-American had been on the floor because he preferred it. Plaintiff then speculated that the white inmate had been on a bottom bunk restriction.

Thus, Plaintiff alleges, generally, that Defendant Glover required one inmate who wanted to sleep on the floor to sleep on a top bunk because another inmate needed the bottom tier. Plaintiff fails to plead or put forth any evidence as to the comparative class. Additionally, Plaintiff fails to put forth evidence that Defendants purposely or intentionally discriminated against Plaintiff on the basis of his race.

Thus, Defendant Glover is entitled to judgment as a matter of law concerning claims of racial discrimination.

### 10. Defendants are entitled to summary judgment as a matter of law concerning allegations of retaliation

Plaintiff broadly alleges that Defendant Jenkins placed him in a suicide cell in retaliation for complaining about cell conditions and that Defendants fabricated an incident report and placed him in segregation for his reluctance to go to court.

In order to support a retaliation claim against Defendants, Plaintiff must allege and prove "that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against [him] that would chill a person of ordinary firmness from engaging in that activity." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007). "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Id.* To avoid summary judgment, however, Plaintiff must submit "affirmative evidence [of] a retaliatory motive." *Id.* (quoting *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006)). With Plaintiff's retaliation allegations, the Court finds that he does not establish a causal connection between the protected activities and the alleged broad claims of retaliation. Plaintiff, provides no specific facts to support the retaliation claims. *Flittie v. Solem*, 827 F.2d 276, 281 (8th Cir. 1987).

Based on Plaintiff's failure to provide specific facts that connect his alleged protected activity to the alleged retaliatory actions of the Defendants, the Court finds that no reasonable fact finder could conclude that Defendants' actions violated Plaintiff's constitutional rights.

### 11. As to Defendants Glover, Arnott, Jenkins, and Roberts, because there was no constitutional violation, these defendants are entitled to summary judgment in their official capacity.

As noted above, Plaintiff also sues Defendants in their official capacity and seeks monetary damages from them. In that vein, the Court notes that where a plaintiff names defendants in their official capacity, he is attempting to recover damages from the government body itself, in this case, Greene County. *See Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Put another way, "[n]aming a government official in his or her official capacity is the equivalent of naming the government entity that employs the official." *Williams v. Shannon Cnty. Jail, et al.*, No. 1:15-CV-146-SNLJ, 2015 WL 5098749 (E.D. Mo. Aug. 31, 2015) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

For a municipality to be liable under § 1983, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." *Monell*, 436 U.S. at 691.

Although a municipality is considered a person that can be liable under § 1983, "it is well established 'that a municipality cannot be held liable on a respondeat superior theory, that is, solely because it employs a tortfeasor.'" *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citations omitted). Liability for a constitutional violation attaches to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee. *Id.*

As to Defendants Glover, Arnott, Jenkins, and Roberts, Plaintiff's claims fail. First, as discussed above, Plaintiff's claims that these four defendants violated his constitutional rights are without merit. Without a constitutional violation by individuals, there can be no claim against Greene County. *See Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curium)) (additional citation omitted). Second, the written policy or custom does not on its face require an individual's rights to be violated, and Plaintiff has not put forth evidence to support his allegations concerning a custom of not providing medicine. Here, the policy or custom articulated in the record provides an inmate medication where (1) the inmate was already taking the same mediation within 30 days of incarceration, (2) medical staff believes to a reasonable degree of medical certainty that it is necessary to treat a life-threatening condition, or (3) medical staff believes to a reasonable degree of medical certainty that an inmate is exhibiting symptoms of a disorder that impairs functioning or mental health such that medication is necessary. In short, Plaintiff has not established either a constitutional violation by Defendants Glover, Arnott, Jenkins, or Roberts, or that these four individual defendants maintain a widespread policy or custom that would require or cause an individual's rights to be violated.

Accordingly, these four Defendants are entitled to summary judgment as to Plaintiff's claims asserted against them in their official capacity.

### B. Qualified Immunity

Defendants broadly argue they are entitled to qualified immunity from Plaintiff's claims. As to claims against Defendants Childress and Richison, the record contains genuine issues of material fact as to whether these Defendants were deliberately indifferent to Plaintiff's serious medical needs relating to Plaintiff's fall from a top bunk. As to the claims against Defendants Wilkins, Walker, and Ussery, the record contains genuine issues of material fact as to whether these three defendants were deliberately indifferent to Plaintiff's serious medical needs for

27

withholding prescription medication. As to the claims against Defendant Morgan, the record contains genuine issues of material fact as to whether Defendant Morgan was deliberately indifferent to Plaintiff's serious medical needs for withholding Plaintiff's inhaler.

The Court next considers whether the rights Plaintiff asserts were "clearly established at the time of the alleged violation, such that a reasonable officer would have known that [his] actions were unlawful." *Clayborn*, 734 F.3d at 809. "Although the defendant bears the burden of proof for this affirmative defense [qualified immunity], the plaintiff must demonstrate that the law was clearly established." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (alteration added). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation and alterations omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Here, as to Defendant Childress, it is clearly established that a fall from a top bunk with a concussion would necessitate medical treatment. Even though a nurse arrived at the scene, Plaintiff's sworn allegations are that Defendant Childress waved the nurse off and told the nurse that Plaintiff would be fine and that he would not see a doctor. Plaintiff continued to suffer pain from the fall for some two weeks. Although it is true that a prison official may rely on a medical professional's opinion if such reliance is reasonable, here, viewing the facts in the light most favorable to Plaintiff, Plaintiff's assignment to a bottom bunk due to the drug protocol should have triggered Defendant Childress's special concern and Defendant Childress should not have waved off a complete medical assessment or substituted his opinion for that of a medical professional. *See McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) (holding that officer's special knowledge of drug consumption are facts that should have triggered special concern, precluding qualified immunity); *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 864 (8th Cir. 2006) ("A medical assessment does not justify qualified immunity when officers ignore it.").

As to Defendant Richison, viewing the facts in the light most favorable to Plaintiff, Defendant Richison knew that Plaintiff should not have been assigned to the top bunk due to medical protocol and yet still assigned him to a top bunk. As a result, the Court finds that there is a genuine issue of material fact as to whether Defendant Richison, in his individual capacity, knew

28

of but deliberately disregarded Plaintiff's serious medical needs. As such, Defendant Richsion is not entitled to qualified immunity. *See Moore*, 255 F.3d at 545 (disputed question of material fact on deliberate indifference claim sufficient to overcome qualified immunity defense).

As to Defendants Wilkins, Walker, and Ussery, the Court finds that Plaintiff's need for access to his prescription medication including his inhalers was clearly established at all relevant times. As set out above, Plaintiff, who was a federal detainee, left the GCJC expressly for assessment by a Bureau of Prisons psychiatrist and returned to the GCJC shortly thereafter with several prescriptions as well as inhalers. Defendant Wilkins was in charge of issuing prescriptive medication and failed to do so in a timely manner, despite the written policy indicating he should do so. Defendants Walker and Ussery were psychologists who acted as part of a treatment team, who were in charge of Plaintiff's mental health needs, and who were responsible for relaying information about Plaintiff's health to Defendant Wilkins. Although the parties dispute the timing of the return of Plaintiff's medications, according to Plaintiff's sworn statements, Plaintiff was not provided all of his psychiatric medications for at least a month after his return from Chicago, and his sworn statements indicate that there are genuine issues of material fact as whether each of these three Defendants are liable for that failure.

Finally, as to Defendant Morgan, Plaintiff's sworn statements indicate that Defendant Morgan was aware of Plaintiff's need for an inhaler and that he deprived Plaintiff of the inhaler because Plaintiff was "getting loud." Because Defendant Morgan knew of Plaintiff's medical need, was capable of providing assistance, and failed to do so, Defendant Morgan is not entitled to qualified immunity. *See McRaven*, 577 F.3d at 983-84 (officer trained in CPR who failed to perform it on inmate in need of assistance was not entitled to qualified immunity); *Hartsfield v. Colburn*, 491 F.3d 394, 401 (8th Cir. 2007) (noting that an inference of deliberate indifference is "heightened when an inmate communicates his distress directly . . . and prison officials fail to respond").

## IV. Discussion: Non-Civil Rights Claims

### A. Defendants are Entitled to Judgment as a Matter of Law as to Plaintiff's Claims Under the Americans with Disabilities Act (ADA)

The ADA consists of three titles addressing discrimination against the disabled in different contexts. Title I prohibits employment discrimination. 42 U.S.C. § 12112. Title II prohibits a "public entity" from excluding disabled individuals from, or denying them the benefits of,

programs, activities, or services, and from otherwise discriminating against them. 42 U.S.C. § 12132. Title III prohibits discrimination by public accommodations involved in interstate commerce, such as hotels, restaurants, and privately operated transportation services. 42 U.S.C. §§ 12182, 12184.

The Supreme Court has recognized that state prisons do indeed provide prisoners with "benefits" of "programs, services and activities." *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). "Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." *Id.*

Here, as best as the Court can discern, Plaintiff alleges four violations of Title II of the ADA: (1) Defendants Glover, Roberts, and Jenkins failed to provide Plaintiff with a bottom bunk; (2) Defendant Morgan failed to provide Plaintiff with an inhaler; (3) Defendant Wilkins' policy of discontinuing all prescribed medications; and (4) Defendant Arnott's various customs and policies. Doc. 11 at 13-15.

To establish a violation of Title II of the ADA, Plaintiff must demonstrate: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484-85 (8th Cir. 2010) (citing *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998)). Title II requires a qualified person with a disability to receive "'meaningful access' to a public entity's services." *Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) (citation omitted).

To meet the first element, Plaintiff must show that he is disabled and "that he 'meets the essential eligibility requirements for participating in the program, with or without reasonable accommodations." *Felty v. Ark. Dep't of Corrs.*, No. 5:07CV0232JLH, 2009 WL 1285835 at *3 (E.D. Ark. May 6, 2009) (citation omitted). The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Courts apply a three-part test to determine whether a plaintiff has a disability under the ADA. *See Felty*, 2009 WL 1285835, at *4 (citation omitted). First, the plaintiff must show a "mental or physical impairment." *Id.* Second, the plaintiff must show that the impairment affects a "major life activity." *Id.* Third, the plaintiff must show that the impairment "substantially limits" a major life activity. *Id.* "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and working." *Id.*; *see* § 12102(2)(A).

Here, even assuming Plaintiff sufficiently alleged mental and physical deficiencies to establish that he has an impairment, he has failed to put forth evidence or even meaningfully allege that his impairment "substantially limits" any "major life activity." Rather, his allegations are broad and conclusory and are bereft of support in the record. Additionally, Plaintiff has failed to put forth evidence or even allege that he was subject to any exclusion, denial of benefits, or other discrimination by reason of his disability.

Accordingly, Defendants are entitled to judgment as a matter of law as to Plaintiff's claims under Title II of the ADA.

## B. Because Plaintiff is no longer is confined at GCJC, his claims for injunctive relief are moot.

In his complaint, Plaintiff broadly seeks injunctive relief. Doc. 11 at 16. To that end, the Court notes that "an inmate's claims for declaratory and injunctive relief to improve prison conditions [becomes] moot" when a prisoner is transferred to another facility and is no longer subject to the conditions of which the prisoner complains. *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999); *Obama v. Burle*, 477 F. App'x 409, 411 (8th Cir. 2012) (same). The Court has no authority to give opinions upon moot questions. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992).

Because Plaintiff is now confined in the Federal Correctional Institution in Butner, North Carolina, his claims for injunctive relief are moot.[13]

---

[13] Additionally, Plaintiff's claims for injunctive relief fail for lack of standing. *See Meuir*, 487 F.3d at 1119-1121 (holding that inmate no longer had standing to seek injunctive relief where he no longer resided at facility, had not shown that he was likely to return to that facility, and therefore had not shown a likelihood of future injury).

**III.    Conclusion**

(1) Defendants' motion for summary judgment (Doc. 183) is granted in part and denied in part;

(2) Defendants Jane Doe One, Jane Doe Two, and Jane Doe Three are dismissed without prejudice; and

(3) Defendants Glover, Arnott, Jenkins, and Roberts are dismissed.

**IT IS SO ORDERED.**

      /s/ Brian C. Wimes

BRIAN C. WIMES

UNITED STATES DISTRICT JUDGE

DATED:  May 7, 2019